FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 9 2006

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| GERMAN DUQUE, | :: | CIVIL ACTION NO. |
| Inmate # 54991-079, | :: | 1:05-CV-1417-CC |
| Plaintiff, | :: | |
| | :: | |
| v. | :: | |
| | :: | |
| UNITED STATES OF AMERICA, | :: | FEDERAL TORT CLAIMS ACT |
| Defendant. | :: | 28 U.S.C. § 1346 |

## ORDER AND OPINION

Now before the Court are Defendant's Motion to Dismiss or, Alternatively, for Summary Judgment [Doc. 16]; Plaintiff's Responses thereto [Docs. 18, 19], with motion for extension of time to file same [Doc. 17]; and Defendant's Reply [Doc. 20].

## I. BACKGROUND

In his complaint, Plaintiff sues the United States and several individual defendants, including the former warden of the United States Penitentiary in Atlanta, Georgia (USP-Atlanta); two medical doctors, Dr. Ivan Negron and Dr. E. Carrbonell, employed at USP-Atlanta; and one medical doctor, Dr. Scott C. Erwood, employed at the Atlanta Medical Center and "on contract with" USP-Atlanta. [Doc. 1 at 2-3.] Plaintiff alleges that he was misdiagnosed as having a condition requiring brain

surgery, which surgery was performed unnecessarily on October 24, 2002. [Id. at 4-5.] Plaintiff claims $20 million in damages arising from the series of physical and psychological ailments he has suffered as a result. [Id. at 4-5, 8, 14 & Ex. 1 (Pl.'s Decl.).] This Court previously dismissed the individual defendants and allowed this action to proceed against the United States as the sole Defendant, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), §§ 2671-2680 (the FTCA). [Doc. 8.]

In support of his complaint, Plaintiff submits his own declaration, subscribed under penalty of perjury, stating that the defendants breached their duty of care by failing to provide various tests and procedures, including "aggressive I.V. antibiotics with repeat CT [computed tomography] scans and MRI's [sic] [magnetic resonance imaging] to determine . . . any change in size of the suspicious lesions." [Doc. 1 Ex. 1 ¶¶ 16, 18.] Plaintiff states that Dr. Carrbonell "admitted to [him] that there should have been several CT scans and MRI's [sic] provided" to adequately diagnose his brain infection. [Id. ¶ 20.]

Plaintiff next submits the response from the Federal Bureau of Prisons to his administrative tort claim, which states, in part, as follows:

> On October 22, 2002, you were transferred to the Atlanta Medical Center, where an MRI was performed. Based on the results of the MRI, you were diagnosed as having a brain tumor and operated on by a

2

> physician at the Atlanta Medical Center, not an employee of the Federal Bureau of Prisons.
>
> . . . . Post-operation you were determined to have had a brain abscess caused by infection. A brain abscess is not a minor infection. It is a major condition which requires surgery to drain and correct. Because of its location, treatment of a brain abscess can lead to complications. Often an abscess resembles a tumor on the tests and surgery is required to correctly identify the issue.

[Doc. 1 Ex. 2 at 1-2.]

Plaintiff also submits a September 28, 2004, letter addressed to "the Attorney for German Duque" from Registered Nurse Jean Collette, who apparently holds herself out as a "Legal Nurse Consultant." [Doc. 1 Ex. 4 at 1.] According to Nurse Collette, "[u]sually, brain abscess is successfully diagnosed by CT Scan and MRI. The first treatment of choice is aggressive antibiotic therapy and serial CT Scan and MRI to plot the course of reduction in size of the abscess. It is only . . . resistant infections that fail to respond to antibiotic therapy that require surgery." [Id.] Because Plaintiff "had none of the signs and symptoms of neurological crisis," i.e., "no signs of increased intra cranial pressure, no vision changes and no seizure activity," Nurse Collette surmised that "surgical intervention should not have been considered first." [Id.] Apparently, however, Nurse Collette required more

3

information about Plaintiff's medical history and about the precise results of his CT and MRI scans in order to determine whether his surgery was warranted. [Id. at 1-2.]

Finally, Plaintiff submits Nurse Collette's review of his medical chart. [Doc. 1 Ex. 6.] Nurse Collette noted therein that Plaintiff "was seen in the [prison] infirmary for the signs and symptoms of sinus problem on sixty one different documented visits" between January 14, 1992, and August 7, 2000. [Id. at 1.] Nurse Collette stated that "[o]ne of the most frequent causes of brain abscess is an untreated or undertreated sinus infection." Nurse Collette nevertheless expressed agreement with the statement in the response to Plaintiff's administrative claim that "the Bureau of Prisons acted promptly in referring [him] for testing and treatment," questioning only "his treatment after he was transferred to Atlanta Medical Center." [Id. at 2.]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings and other documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp.

4

v. Catrett, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible."  Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted).  Morever, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

The movant bears the initial burden of demonstrating that it is entitled to summary judgment.  Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  It may do so by showing "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  Once the movant has properly supported its motion, the non-movant must then "come forward with specific facts showing that there is a *genuine issue for trial*," i.e., that the evidence is sufficient to support a jury verdict in its favor.  Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th

5

Cir. 2002) (internal quotations omitted).  See also Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "the non-moving party must come forward with *significant, probative evidence*") (emphasis added). "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

Nevertheless, "courts have been reluctant to apply" to pro se prisoners the Rule 56(e) requirement that a non-movant "cannot rely on his pleadings, but must file a response that includes other evidence." Lawrence v. Wiley, Civil Action No. 1:03-CV-2970, 2006 U.S. Dist. LEXIS 4917, at *15-*16 (N.D. Ga. Jan. 24, 2006). See also Gonzalez v. Long, 889 F. Supp. 639, 642 (E.D.N.Y. 1995) (allowing pro se prisoner additional time to respond to summary judgment motion, "mindful that *pro se* litigants should be given special latitude" in doing so, but noting that the "abject failure to comply with the requirements of Rule 56(e) and [the Court's local rule] would normally require the Court to grant" the summary judgment motion).

A motion for summary judgment may be supported or opposed with "the pleadings, depositions, answers to interrogatories, and admissions on file, together

AO 72A
(Rev.8/82)

with the affidavits, if any." Fed. R. Civ. P. 56(c).[1] "As a general rule, the court may consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial." Property Mgmt. & Inv., Inc. v. Lewis, 752 F.2d 599, 604 n.4 (11th Cir. 1985) (assuming without deciding "that authenticity and completeness are among the evidentiary requirements of Rule 56"). See also Woods v. City of Chicago, 234 F.3d 979, 987-88 (7th Cir. 2000) (stating that Rule 56(e)

---

[1]This Court's Local Rules provide additional requirements. "A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts." N.D. Ga., LR 56.1.B.(1). The response to the motion for summary judgment "shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts." N.D. Ga., LR 56.1.B.(2)a.(1). "This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1)." N.D. Ga., LR 56.1.B.(2)a.(2).

"does not *require* that all supporting material be submitted in affidavit form,"[2] and stating further that a "court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits") (citation and internal quotations omitted).

## III.  CONTENTIONS OF THE PARTIES

### A.    Defendant's motion for summary judgment[3]

#### 1.    Defendant's statement of undisputed material facts

Defendant sets forth the following material facts.  [Doc. 16 "Statement of Undisputed Material Facts" (hereinafter "Def.'s Facts").]  At all times relevant to this action, Plaintiff was an inmate at USP-Atlanta.  [Def.'s Facts ¶ 1.]  On October 16,

---

[2]An affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence," and may be supported by "[s]worn or certified copies" of documents referred to in the affidavit.  Fed. R. Civ. P. 56(e).  An "unsworn declaration, certificate, verification, or statement" may be used in the place of a sworn affidavit to support or oppose a motion for summary judgment if the declaration "is subscribed by [the declarant], as true under penalty of perjury, and dated."  See 28 U.S.C. § 1746.

[3]Although this Court did not previously rule as to whether Defendant's motion was to be construed as a motion to dismiss or as a motion for summary judgment, the Clerk of Court, in docketing the motion, posted a Notice to Respond to Summary Judgment Motion, and Plaintiff has responded to the motion with, among other things, a Statement of Disputed Material Facts. [See Docs. 16, 18.] Accordingly, the instant motion is properly before the Court as a motion for summary judgment.

AO 72A
(Rev.8/82)

2002, Plaintiff complained to the USP-Atlanta medical staff of "vomiting and a headache which had been ongoing for two days."  Plaintiff was diagnosed with a possible migraine, and a skull x-ray was ordered.  [Id. ¶ 2; see Doc. 16 Ex. 1 (Negron[4] Decl.) ¶ 7.]  On October 17, 2002, the USP-Atlanta medical staff treated Plaintiff twice for his severe headache. On October 18, 2002, Plaintiff was examined by a staff physician at USP-Atlanta and transferred immediately to Southwest Hospital to "r/o [rule out] encephalitis vs. cerebral aneurysm vs. cerebral tumor."  A CT scan was performed at Southwest Hospital, and Plaintiff was then transferred immediately to Grady Hospital for a neurosurgical evaluation. [Def.'s Facts ¶¶ 3-5; see Negron Decl. ¶¶ 8-10.]  On October 22, 2002, Plaintiff was transferred to the Atlanta Medical Center, where an MRI revealed "a large ring enhancing mass in the right temporal lobe with significant edema surrounding it and some mass effect." Suspecting a brain tumor, Dr. Scott C. Erwood of the Atlanta Medical Center performed a right temporoparietal craniotomy on Plaintiff on October 24, 2002, and determined thereby that Plaintiff did not have a tumor, but instead had "a significant

_____

[4]It is apparently undisputed that Dr. Negron was on the USP-Atlanta medical staff at all times relevant to these proceedings.  [See Doc. 1 at 2.]  At the time he made his declaration, Dr. Negron was the Clinical Director at the Federal Correctional Complex in Coleman, Florida.  [Negron Decl. ¶¶ 1-4.]

AO 72A
(Rev.8/82)

brain abscess, which was drained and otherwise treated." [Def.'s Facts ¶¶ 6-7; <u>see</u> Negron Decl. ¶¶ 11-12.] On November 1, 2002, Plaintiff was discharged from the Atlanta Medical Center and returned to USP-Atlanta. [Def.'s Facts ¶ 8; <u>see</u> Negron Decl. ¶ 15.]

"The Bureau of Prisons ('BOP') contracts with companies, such as Medical Development International, which in turn contract with various outside healthcare contractors, including Southwest Hospital, Grady Hospital and Atlanta Medical Center, to provide medical treatment to BOP inmates." All such "outside medical providers are independent contractors." [Def.'s Facts ¶¶ 9-10; <u>see</u> Negron Decl. ¶¶ 13-14.] All of Plaintiff's medical treatment "from the time he was transferred to Southwest Hospital on October 18, 2002, until after he was discharged from [the Atlanta Medical Center] and returned to USP-Atlanta on November 1, 2002," was provided by independent contractors, not by BOP employees. BOP medical staff exerted no control over "the time, method or manner of the treatment" that these contractors provided. [Def.'s Facts ¶¶ 10-11; <u>see</u> Negron Decl. ¶¶ 14-15.]

2.    **Defendant's arguments**

Defendant, the United States, notes that its potential liability herein is to be determined "in accordance with the law of Georgia." [Doc. 16 Mem. of Law at 4.]

Defendant argues that Dr. Erwood, the only medical provider against whom Plaintiff made any "specific factual allegations" in his complaint, is an "outside contractor," for whose alleged torts the United States is not liable under the FTCA. Defendant notes that "[e]ven under Georgia law, a principal is generally not liable for the negligence of an independent contractor." [Id. at 6-8.] Defendant argues further that Plaintiff's "general allegations" of negligence against federal employees relate "only to the medical treatment rendered by the independent healthcare contractors." [Id. at 9.] Accordingly, Defendant argues, Plaintiff has failed to state a cause of action against any federal employee, and, therefore, summary judgment is appropriate. [Id. at 9-10.]

**B.    Plaintiff's response**

**1.    Statement of disputed material facts**

Plaintiff presents a statement of disputed material facts, containing seven numbered paragraphs, which, however, does not conform to the requirements of LR 56.1.B(2)(a)(2), supra. [Doc. 18 "Statement of Disputed Material Facts" (hereinafter "Pl.'s Facts").]   Plaintiff states that on October 18, 2002, USP-Atlanta staff physicians misdiagnosed him "as having one or the other of R/O Encephalitis, or Cerebral Aneurysm, and or a Cerebral Tumor (Brain Tumor)." [Pl.'s Facts ¶ 1.]

11

According to Plaintiff, it was this misdiagnosis that "set off a state of emergency as to [his] condition," which, in turn, led the staff physicians to bypass "medicated therapeutic measures" and to transfer him to Southwest Hospital in an "aura of an extreme emergency state." [Id.] Plaintiff states that his medical file contains no record of any of the following: a CT scan allegedly performed at Southwest Hospital on October 18, 2002; a neurosurgical assessment at Grady Hospital on the same day, ostensibly performed by Dr. Erwood; or an MRI at the Atlanta Medical Center four days later, on October 22, 2002, in an "apparent down sized emergency state." [Id. ¶¶ 2-4.] Noting that the only evidence of the MRI and brain tumor misdiagnosis is the consent form that Plaintiff signed "in his distressed position," Plaintiff states that "the matter of [the] MRI and report evaluation are still in dispute." [Id. ¶ 4.]

Plaintiff states further that the treatment he received from Dr. Erwood, namely, draining his brain abscess, was "the exact treatment that BOP" could have provided to Plaintiff "in the first instance within the institution," which places Dr. Erwood's "report of evaluation prior to surgery and post surgery . . . in dispute." [Id. ¶ 5.] Plaintiff also disputes the existence of any contracts between the BOP and private companies, either directly, or indirectly via subcontracts, to provide health care to USP-Atlanta inmates, in part because Dr. Negron's declaration, without more, is not

12

sufficient proof of the existence of any such contracts.  [Id. ¶ 6.]  Plaintiff states that he does not attribute Dr. Erwood's negligence to the BOP, but rather the "acts and omissions prior to Plaintiff's admittance *to the contractor hospitals*, acts which 'proximately caused' [his] injury (the opening of the head erroneously)."  [Id. ¶ 7 (emphasis added).]  Plaintiff states that "the insufficient duty of care rendered by the BOP is what it at issue here, and now clearly in dispute."  [Id.]

### 2.    Plaintiff's arguments

Plaintiff first argues that this Court has jurisdiction, pursuant to 28 U.S.C. § 1367, over the "now known contractor and subcontractor to wit Medical Development International (MDI), Atlanta Medical Center (AMC) and Dr. Scott C. Erwood."  [Doc. 18 Mem. of Law at 4.]  Plaintiff further argues that the United States and its contractors or subcontractors breached their duty of care to Plaintiff by the following acts or omissions: (1) failing to diagnose his condition properly, especially in light of his history of chronic sinusitis; (2) failing to provide "posit[r]on emission tomography," "Glasgow Coma Scale," "aggressive antibiotic treatment prior to surgery," "repeated CT and MRI scans," and a radiological evaluation; (3) failing to seek signs of a brain tumor or to take precautionary measures prior to brain surgery; and (4) "[p]roviding a warrantless brain surgery."  [Id. at 7-8.]

13

Plaintiff argues that the foregoing breaches of duty by federal employees "created a nexus" between these breaches and Plaintiff's injuries, "first by the misdiagnosis, second by [the] failure to take the proper . . . precautionary measures[,] and third by creating and transferring [him] to the contractors in an emergency state." [Id. at 8.] Plaintiff states that, because Dr. Erwood and the other contractors relied upon the misdiagnosis of Plaintiff's condition by the USP-Atlanta medical staff, the chain of causation between the breach of duty by the USP-Atlanta staff and the "warrantless brain surgery" remains unbroken by any intervening or superseding cause. [Id. at 8-11.] Plaintiff states that the USP-Atlanta medical staff was negligent in misdiagnosing, as a possible brain tumor or aneurysm, his chronic and well-documented sinusitis and related conditions, thereby setting the wheels in motion that led directly to his unnecessary brain surgery, as a result of which he still suffers from extensive physical ailments. [Id. at 11-13 & Exs. 1-5; see Doc. 19 Suppl. Mem. of Law at 1-7 & Exs. A-P.] Plaintiff claims that the United States is liable for "negligent supervision" of the independent contractors, "aggravated [by] the fact that [it] had full access to [his] medical history, . . . [but] approved and authorized a diagnosis and treatment elaborated by a contractor and sub-contractor

14

without full access to the patient['s] medical history."[5] [Doc. 19 Suppl. Mem. of Law at 7-8.] Plaintiff also argues that the United States can be held liable for completely delegating to a contractor the decision to engage in an inherently dangerous activity, i.e., brain surgery. [Id. at 8.]

## C.   Defendant's reply

In reply, Defendant first notes that Plaintiff's responses to Def.'s Facts are not in compliance with this Court's Local Rules because they do not correspond to the numbered undisputed facts set forth in Def.'s Facts. [Doc. 20 at 1-2.] Defendant contradicts Plaintiff's assertion of misdiagnosis by the USP-Atlanta medical staff by noting that the staff sent Plaintiff to Southwest Hospital on October 18, 2002, "to rule out encephalitis, cerebral aneurysm, and or a cerebral tumor as possible causes of his symptoms. Thus, no definitive diagnosis was made by BOP staff or any other federal employee. Rather, Plaintiff was sent to several hospitals for testing so that a precise diagnosis could be made." [Id. 2-3.] Defendant next notes that, although Plaintiff now questions whether a CT or MRI was ever performed, he alleged in his complaint that these procedures were indeed performed. [Id. at 3-5.]

---

[5]Plaintiff has attached portions of his medical history, dating back to May 1992, to both his initial and supplemental responses to the summary judgment motion. [See Docs. 18, 19.]

15

Defendant also notes that Nurse Collette, Plaintiff's own purported medical expert, stated in her April 22, 2005, analysis of Plaintiff's medical chart, attached as an exhibit to Plaintiff's complaint, that she agreed with the assertion that "the Bureau of Prisons acted promptly in referring [Plaintiff] for testing and treatment," and she questioned only "his treatment after he was transferred to Atlanta Medical Center." [Id. at 8 & n.8; see Doc. 1 Ex. 6 at 2.] Defendant concludes that, even though Nurse Collette's opinion is not admissible as expert medical evidence because she is not a physician, her opinion "is the only medical evidence produced by Plaintiff and it fails to support the allegations of negligence against BOP." [Doc. 20 at 8-9 & n.9.]

## IV. DISCUSSION

### A.    The federal tort claim

"It is well settled that sovereign immunity bars suits against the United States except to the extent that it consents to be sued." Means v. United States, 176 F.3d 1376, 1378 (11th Cir. 1999). The FTCA provides a "limited waiver" of this sovereign immunity, "making the United States liable for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office [or] employment.'" JBP Acquisitions, L.P. v. United States ex rel. FDIC, 224 F.3d 1260,

16

1263 (11th Cir. 2000) (quoting 28 U.S.C. § 1346(b)(1), which also provides that liability attaches "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"). The United States is the only permissible defendant in an FTCA action. See 28 U.S.C. § 2679(b)(1).

### 1.    FTCA liability for the actions of independent contractors

"Although state law governs the substantive duties of the United States under the FTCA, whether a person is a contractor or an employee is determined under federal law." Cruz v. United States, 70 F. Supp. 2d 1290, 1292 n.2 (S.D. Fla. 1998) (citation omitted). The FTCA provides that an officer or employee of "any federal agency" is an "[e]mployee of the government." However, a "contractor with the United States" is not a federal agency. 28 U.S.C. § 2671. "Thus, the United States is not liable for the acts or omissions of the independent contractors that it employs." Tisdale v. United States, 62 F.3d 1367, 1371 (11th Cir. 1995). "The true test for independent contractor status addresses the United States' power to control the detailed physical performance of the contractor, or, in other words, whether [the contractor's] day-to-day operations are supervised by the Federal Government." Id. (internal quotations omitted).   Simply setting standards for a contractor's

17

performance or fixing "specific and precise conditions to implement federal objectives" does not "convert the acts of entrepreneurs . . . into federal governmental acts." Id. (internal quotations omitted).

### 2.  Medical malpractice in Georgia

As noted above, "the law of the place where the act or omission occurred" provides the substantive elements of a federal tort claim.  See 28 U.S.C. § 1346(b)(1).  Accordingly, the Georgia law of medical malpractice controls Plaintiff's claims against the USP-Atlanta medical staff.

### a.  The standard of care

Under Georgia law, there are "[t]hree essential elements" to a medical malpractice claim: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." Zwiren v. Thompson, 578 S.E.2d 862, 864 (Ga. 2003) (citing O.C.G.A. § 51-1-27).  It is presumed "that the medical or surgical services were performed in an ordinarily skilful [sic] manner, and the burden is on the one receiving the services to show a want of due care, skill, and diligence." Shea v. Phillips, 98 S.E.2d 552, 554 (Ga. 1957).  The "standard of care is that which, under similar conditions and like

18

circumstances, is ordinarily employed by the medical profession generally," and "*the question of compliance with the required standards must be presented through expert testimony.*" Kenney v. Piedmont Hospital, 222 S.E.2d 162, 167 (Ga. App. 1975) (emphasis added).

### b.   Causation

"Negligence alone is insufficient to sustain recovery.  It must be proven that the injury complained of proximately resulted from [the] want of care or skill.  A bare possibility of such result is not sufficient." Goggin v. Goldman, 433 S.E.2d 85, 87 (Ga. App. 1993).  In general, "causation must be established through expert testimony," but questions about causation "are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." Walker v. Giles, 624 S.E.2d 191, 197 (Ga. App. 2005) (internal quotations omitted), cert. denied, Case No. S06C0748 (Ga. Apr. 25, 2006).  Moreover, "a tortfeasor cannot be held liable if there intervened between [his act] and the [plaintiff's] injury a distinct, successive, *unrelated*, efficient cause of the injury." Coleman v. Atlanta Obstetrics & Gynecology Group, P.A., 390 S.E.2d 856, 858 (Ga. App. 1990) (internal quotations omitted).  See also McQuaig v. McLaughlin, 440 S.E.2d 499, 502-03 (Ga. App. 1994) (noting that "[i]t is well settled that there can be no proximate cause where

19

there has intervened . . . an independent . . . act (or omission) of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury"; and affirming directed verdict for hospital because, even though hospital employees "disregarded standing orders to report to the [treating] physician certain fluctuations in [the patient's] vital signs and bleeding," the physician "was fully aware of the unreported signs and symptoms" by the following day "and still failed to act in the manner" plaintiffs alleged was "professionally adequate").

However, if "the injury [at issue] was the result of malpractice [by a second medical practitioner] in response to [the] malpractice" of a previous practitioner, the first practitioner may have "inexorably started the chain of events" that led to the plaintiff's injury. Coleman, 390 S.E.2d at 858, 856-59 (reversing directed verdict in favor of doctor whose negligent treatment caused plaintiff to require a therapeutic abortion, which, when performed negligently by a second doctor, ultimately caused severe injury to plaintiff). See also Walker, 624 S.E.2d at 193-96 (reversing directed verdict in favor of three physicians who misdiagnosed pregnant plaintiff's appendicitis, and concluding that the three doctors were potentially liable despite the

20

misdiagnosis by plaintiff's subsequent care givers, who failed to begin surgical intervention before her appendix ruptured).

In such circumstances, "the connection between the original wrongful act and the subsequent injury [may be] such that [the original act's] probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, . . . [who] is responsible for all of the consequences resulting from the intervening act." Coleman, 390 S.E.2d at 859. See also Walker, 624 S.E.2d at 200-01 (stating that "Georgia cases permitting joint and several liability of two or more physicians who independently treat a patient at different times but together cause an indivisible injury to the plaintiff implicitly reject the notion that a first-treating physician is absolved of legal responsibility as a matter of law"; noting the well-settled general proposition "that *proximate cause is generally an issue for the jury, and there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several actors*"; and also noting the court's own prior holding that a second physician's negligent misdiagnosis of a serious wound to the plaintiff's arm "merely compounded (but did not cut off) the initial negligence of the first physician" in making a similar misdiagnosis) (internal quotations omitted) (emphasis added). Schriever v. Maddox, 578 S.E.2d 210, 211-12

21

(Ga. App. 2003) (noting, in the aforementioned case, that by the time a third physician properly diagnosed plaintiff's arm, she had suffered permanent damage, for which "corrective surgery was no longer an option").

**B.    Analysis**

**1.    The independent contractors**

Defendant asserts that the United States cannot be held liable for the alleged medical negligence of Dr. Erwood because he was an independent contractor, not a federal employee, when he treated Plaintiff.   Although Plaintiff disputes this assertion in his statement of disputed material facts, he consistently has referred to the Atlanta Medical Center and Dr. Erwood as independent contractors, not only in his complaint, but also in various other pleadings filed in this Court, including his statement of disputed material facts. See supra. Accordingly, there is no genuine issue of material fact regarding Defendant's potential liability for the actions of Dr. Erwood or other medical care givers at the Atlanta Medical Center, Southwest Hospital, or Grady Hospital. Defendant cannot be held liable for their actions. See Tisdale, 62 F.3d at 1371.

22

### 2.     The USP-Atlanta medical staff

However, under Georgia law, as set forth supra, Defendant may be liable for

the actions of the USP-Atlanta medical staff, despite the staff's referral of Plaintiff

to Southwest Hospital on October 18, 2002, for diagnosis and treatment.  In order to

prevail at trial, Plaintiff must establish by expert medical evidence that the failure of

the USP-Atlanta medical staff to diagnose and treat his brain condition in a

non-invasive manner violated the duty of "care, skill, and diligence" that physicians

generally owe to their patients.  Plaintiff also must establish that their violations, if

any, proximately caused his injuries by initiating "the chain of events" that led to

those injuries.  See Coleman, 390 S.E.2d at 858.  In this regard, it is clear that the

possible negligence of Dr. Erwood and other subsequent care givers does not

necessarily "cut off" Defendant's potential liability for the possible negligence of the

USP-Atlanta medical staff. See, e.g., Walker, 624 S.E.2d at 200, 201-02 (concluding

that "it was reasonably foreseeable" to the physicians who initially failed to properly

diagnose and treat plaintiff's appendicitis that her subsequent treatment "would be

rendered in a negligent manner," and rejecting the argument that "the subsequent

malpractice . . . was not foreseeable as a matter of law because" there was expert

testimony "that it would not have been foreseeable . . . that the general surgeons were

23

going to be negligent"). Moreover, in a medical malpractice action in Georgia, causation is to be determined by the factfinder, except in "clear, plain, palpable and undisputed cases." Id. at 197.

There is very little medical evidence in the record regarding the duty of care that the USP-Atlanta medical staff owed to Plaintiff. Defendant has presented no expert medical evidence as to whether the USP-Atlanta medical staff violated their duty of care or whether such a violation, if any, proximately caused Plaintiff's alleged injuries. The burden of proof at trial, however, would be upon Plaintiff, not Defendant, to establish the elements of Plaintiff's medical malpractice claims. Nevertheless, other than his prison medical records and Dr. Carrbonell's alleged admission, as set forth in Plaintiff's declaration, the only evidence that Plaintiff has provided to support his claims are Nurse Collette's opinions. As discussed infra, these opinions are insufficient under Georgia law to support Plaintiff's claims against the USP-Atlanta medical staff.

"[T]he proof ordinarily required to overcome [the] presumption of care, skill, and diligence [afforded to a physician] is that given by physicians or surgeons as expert witnesses." Shea, 98 S.E.2d at 555. See also Riggins v. Wyatt, 452 S.E.2d 577, 578 (Ga. App. 1994) (concluding that "a tenured professor of applied

24

biomechanics in surgery at Cornell University Medical College" was not qualified as an expert on "the standard of care of a practicing surgeon in treating patients with biomechanical devices"; stating that "[a] person cannot be qualified as an expert in an area where he or she would not be lawfully qualified (by holding a valid state license) to perform the treatment which is the subject of the expert opinion"; and distinguishing cases "where an 'overlap' of medical expertise allows one in a different profession to testify as to a standard of care applicable to both").

Nevertheless, the Georgia Supreme Court has held that it was proper to allow a nurse "to testify as an expert witness as to standards of care in keeping sterile a needle used to draw blood from a patient," at least in part because the doctor himself had testified "that the drawing of blood is not treatment exclusively within the professional skills of medical doctors." Avret v. McCormick, 271 S.E.2d 832, 833 (Ga. 1980) (stating that "[a] nurse may or may not be qualified to state an inference as to a medical or surgical matter according to the extent of his or her training and experience and the subject of the inference"). See also McDowell v. Brown, 392 F.3d 1283, 1296-97 (11th Cir. 2004) (concluding that, "[i]n accordance with Georgia law," medical doctors were "competent to render [expert] opinions as to the applicable standard of care" for the defendant nurses; noting that, under Georgia law,

"[f]or a witness to constitute an expert competent to testify, his realm of expertise must encompass knowledge of the standard of care applicable to the defendant-professional as to at least one of the matters on which the plaintiff's malpractice claim is based"; and further noting that "Georgia courts have qualified nurses to testify against doctors") (internal quotations omitted); Tenet Healthcare Corp. v. Gilbert, 627 S.E.2d 821, 826 (Ga. App. 2006) (stating that "[t]he law in Georgia does not require that only medical doctors be permitted to give testimony regarding a medical issue, but allows others with certain training and experience to testify on issues within the scope of their expertise," and noting that the Georgia Court of Appeals had "specifically rejected any requirement that an expert who testifies regarding the standard of care for physicians . . . be a physician at the time the alleged malpractice occurred"), cert. denied, Case No. S06C1197 (Ga. July 13, 2006).

Here, there is no indication in the record that the diagnosis and treatment of Plaintiff's medical condition at issue are matters "within the scope of [Nurse Collette's] expertise," see Tenet Healthcare Corp., 627 S.E.2d at 826, rather than matters "exclusively within the professional skills of medical doctors," see Avret, 271 S.E.2d at 833. Furthermore, to the extent that Nurse Collette is qualified to offer

26

an expert medical opinion on these matters, her opinions are neither sworn nor subscribed under penalty of perjury.[6]  Finally, the Court notes that even Nurse Collette seems to admit that the USP-Atlanta medical staff acted properly in promptly referring Plaintiff to a specialist for testing and treatment.  Moreover, although stating that the preferred treatment for Plaintiff's condition would have been "aggressive antibiotic therapy," Nurse Collette never states an opinion that the USP-Atlanta medical staff violated their duty of care to Plaintiff.  Therefore, despite Plaintiff's pro se status, the Court cannot accept Nurse Collette's opinions as competent and admissible evidence in support of Plaintiff's medical malpractice claims against the USP-Atlanta medical staff.  Accordingly, there is no admissible evidence in the record to support Plaintiff's claims.[7]

---

[6]See O.C.G.A. § 9-11-9.1(a) (requiring that a plaintiff in a medical malpractice case "file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim").

[7]Dr. Carrbonell's alleged statement to Plaintiff that "there should have been several CT scans and MRI's [sic] provided" to diagnose Plaintiff's infection, although possibly falling into a hearsay exception under Fed. R. Evid. 801(d)(2)(D), does not alter the Court's conclusion in this regard because the statement neither admits, nor expresses a medical opinion, that the USP-Atlanta medical staff violated the duty of care owed to Plaintiff.

27

It appears that Dr. Erwood performed brain surgery on Plaintiff based on an incorrect diagnosis of his condition. [See Doc. 16 Ex. 2-1 at 1-2.] Defendant does not dispute this misdiagnosis, claiming instead that the USP-Atlanta medical staff made "no definitive diagnosis," but rather referred Plaintiff to the independent medical contractors "for testing so that a precise diagnosis could be made." [Doc. 20 at 2-3.] The Court finds no competent and admissible medical evidence in the record to support Plaintiff's contentions that (1) the USP-Atlanta medical staff violated their duty of care to Plaintiff by failing to diagnose and treat his condition and referring him instead to a specialist to determine the source of his symptoms, and (2) Defendant ultimately may be held liable for any such violation because the referral was a proximate cause of Plaintiff's alleged injuries.  To the contrary, it seems likely to the Court that the USP-Atlanta medical staff's prompt referral of Plaintiff to the independent medical contractors for a more definitive diagnosis of his condition satisfied their duty of care to Plaintiff.  In any event, without admissible expert medical evidence in the record to establish a genuine issue of material fact as to whether, under Georgia law, Plaintiff's alleged injuries are attributable to Defendant, the Court concludes, as a matter of law, "that there is an absence of

28

evidence to support" Plaintiff's medical malpractice claims against the USP-Atlanta medical staff.  See Celotex, 477 U.S. at 325.

## V.  CONCLUSION

For the foregoing reasons –

Defendant's Motion to Dismiss or, Alternatively, for Summary Judgment [Doc. 16], construed as a motion for summary judgment, is **HEREBY GRANTED**;

Plaintiff's motion for an extension of time to respond to the motion [Doc. 17] is **GRANTED** nunc pro tunc; and

this action is **HEREBY DISMISSED**.

**IT IS SO ORDERED**, this 9th day of August , 2006.


CLARENCE COOPER
UNITED STATES DISTRICT JUDGE

29